**WHOLE COURT**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office by 12:00 p.m. on Monday, December 16, 2013 to be deemed timely filed.

**December 13, 2013**

# In the Court of Appeals of Georgia

A13A0988. DOSS & ASSOCIATES v. FIRST AMERICAN TITLE INSURANCE COMPANY, INC.

A13A0989. FIRST AMERICAN TITLE INSURANCE COMPANY v. DOSS & ASSOCIATES.

A13A0990. GEROVA ASSET BACKED HOLDINGS, L. P. v. DOSS & ASSOCIATES.

BOGGS, Judge.

This case arises from a $4.75 million loan from Stillwater Asset-Backed Fund, LP ("Stillwater")[1] to Cohutta Water, Inc. Steve Carroll, Cohutta's president and CEO, guaranteed the loan and executed a security deed for seven parcels of real estate to secure it. Stillwater did not obtain a first position lien on one of the tracts (48.2 acres) due to a prior encumbrance held by Branch Banking & Trust ("BB&T") for a

---

[1] Stillwater later changed its name to Gerova Asset Backed Holdings, L. P. ("Gerova"). Because all of the relevant documents and the parties' briefs refer to Gerova as Stillwater, the opinion will also refer to Gerova as Stillwater.

personal loan to Carroll. In 2008, Cohutta defaulted on the Stillwater loan, and Carroll breached the guaranty and filed for bankruptcy. In 2009, BB&T foreclosed on the 48.2 acre tract and paid $1 million as the highest bidder; the total principal amount of the BB&T loans secured by the property was $910,831.00. Stillwater received title to land valued at $5.6 million from the foreclosure sale of the remaining lots securing Carroll's guarantee.

Stillwater subsequently sued the closing attorney and title agent for the loan, Doss & Associates ("Doss"), as well as First American Title Insurance Company, Inc. ("First American"), claiming it should have received a first-position lien on the 48.2 acre tract in the closing and seeking damages. First American asserted a cross-claim against Doss for contractual indemnity and professional negligence.

In Case No. A13A0988, Doss appeals from the trial court's grant of partial summary judgment in favor of First American on its contractual indemnity claim, asserting that it was premature for the trial court to rule upon the claim and that it cannot be held liable for an insurer's bad faith failure to pay a claim. In Case No. A13A0989, First American cross-appeals from the trial court's order denying summary judgment in its favor, claiming it cannot be held liable for Stillwater's interest, costs, and attorney fees associated with the loan, that Stillwater cannot prove

a bad faith claim, and that Doss should be required to indemnify it for its attorney fees. In Case No. A13A0990, Stillwater appeals from the trial court's order granting summary judgment in favor of Doss on Stillwater's claim for breach of an alleged oral escrow agreement.[2] For the reasons explained below, we affirm in Case No. A13A0988; affirm in part and reverse in part in Case No. A13A0989; and reverse in Case No. A13A0990.

### Case No. A13A0990

In its sole enumeration of error, Stillwater contends that the trial court erred by failing to conclude that genuine issues of fact exist as to whether an oral escrow agreement existed between it and Doss in connection with the closing of the $4.75 million loan. We agree and therefore reverse.

The record shows that on December 14, 2006, Stillwater's counsel in New York, Allison Prouty, orally requested that Doss execute an escrow agreement in connection with the closing. No later than the morning of December 20, 2006, Doss provided Stillwater's counsel with a form escrow agreement to Stillwater's counsel that had been obtained from a "form library" on a First American website.

---

[2] Based upon the trial court's ruling, Stillwater's claim based upon Doss' breach of a closing protection letter remains pending below.

At 11:28 a.m. on December 20th, Prouty sent an email to Michelle Tipton, a paralegal at Doss, thanking her for sending a "form of escrow agreement" in addition to other documents. Prouty requested that Doss prepare an escrow agreement for her firm "with all the normal provisions pertaining to any escrow agreement" in order for Stillwater "to wire loan proceeds into your firm's escrow account." She also stated:

Escrow Agreement:

Specific to language in the title company's brief form you sent, you need to list, after "as follows:" at the end of the first paragraph, the prior liens, taxes and title premiums and recording charges to be paid off at closing. Basically you will need to determine the figures that will appear in the borrower's title bill, listing all payments to be made at closing prior to release of the balance of funds to the borrower. Paragraph 2 is in reverse: our client, the depositor, must be indemnified if [] your firm's obligations as escrowee are not performed - - Stillwater will not be indemnifying your firm. Paragraph 3 should be struck, as it does not apply to this transaction.

Less than two hours later, Lynn Doss, the closing attorney, sent a reply to Prouty stating in part, "As to the escrow agreement. . . . in 22 years of practicing real estate law, we have never had a request to prepare or execute such a document in order for lenders to tender funds. If there is something in particular that you want, send it to me and I will review it." Although Doss did not hear back from Prouty,

Doss' paralegal, Tipton, sent an email to Prouty at 5:08 p.m. on December 20, stating: "Attached is the r[e]vised escrow agreement for your review. Let me know if you need something more specific." The attached escrow agreement included the changes requested by Prouty with regard to paragraph 2 and the listing of amounts to be paid off at closing.

On December 21st at 9:44 a.m., another New York attorney representing Stillwater, Stephen Semian, sent an email to Lynn Doss, copied to Tipton, that stated: "As far as I know, we are still waiting for your redraft of the escrow agreement, opinion, payoff letters and a list of liens that are being released (along with exact payoff amounts). Funds would arrive by wire - please send your wiring instructions to me, as I'll be preparing the direction letter." Tipton sent the following reply to Semian at 10:14 a.m.: "I sent everything to Allison [Prouty] on Wednesday about 330 or 400 p.m. I have attached the escrow agreement to this email for your review. If I need to add anything, please let me know."

At 1:31 p.m., Prouty sent an email to Lynn Doss stating: "The fourth email received from your office attached a revised escrow agreement. The most significant problem with this is that it provides that the entire balance of the loan proceeds will be released and paid to Mr. Carroll, who is not the borrower." At 4:38 p.m., Lynn

5

Doss sent another email to Prouty attaching "the revised escrow agreement." The new revision corrected the error mentioned by Prouty in her email. Prouty testified that Doss ultimately "provided an escrow agreement that was acceptable." At another point in her deposition, she testified that the last version of the agreement "actually seemed to have most of the requirements I had asked for."

Semian sent an email at 8:00 p.m. on the evening of the closing (December 22), requesting Tipton to "send up a signed escrow agreement, but it is undisputed that neither Doss nor Stillwater signed any version of the escrow agreement. Semian testified that while a signed escrow agreement was "wanted before closing," he was not concerned that it was not signed before the closing on December 22nd, because they "had agreed on the final form of the agreement."

Lynn Doss testified that she did not sign the escrow agreement before the closing based upon an email she received from Prouty on December 21, 2006 at 5:17 p.m. Doss interpreted that email to mean that Stillwater was no longer insisting upon a first position for the 48.2 acre tract as a condition for closing.[3] Doss also believed, based upon this email, that a subordination agreement from BB&T would no longer

_____

[3] Prouty disputes Doss' interpretation of her email and contends that she was clearly referring to a different tract that was not part of the closing and for which no title had previously been examined.

be a condition of closing and that Stillwater would address it after closing.[4] Based upon this understanding, the provision in the last version of the escrow agreement requiring her to obtain a first lien on all properties listed, including the 48.2 acre tract, "was obviously a mistake because there's nothing that indicates that they're paying off BB&T." She testified that she "presumed" Stillwater's counsel no longer wanted the escrow agreement when she received no further communication about it after sending the last revised draft. Although she testified that she asked Stillwater's counsel "to tell me if my draft escrow agreement was acceptable," her last email stated only: "Attached is the revised escrow agreement." Nowhere in her email does she ask if the last revised escrow agreement is acceptable.

1. "To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." OCGA § 13-3-1.

> In determining whether there was a mutual assent, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting

---

[4] Prouty testified in her deposition that she was assured by Tipton on December 22, 2006 that Steve Carroll, who guaranteed the loan, had obtained the subordination agreement and would deliver it later that day. She further testified that she funded the loan based upon this representation.

party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent. Further, in cases such as this one, the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement. Where such extrinsic evidence exists and is disputed, the question of whether a party has assented to the contract is generally a matter for the jury.

(Citations and punctuation omitted.) *Turner Broadcasting System. v. McDavid*, 303 Ga. App. 593, 597 (1) (693 SE2d 873) (2010). Additionally,

A formal, written agreement may be a condition precedent to the formation of a binding contract, when the parties so intend. When the parties intend to memorialize with a formal document an agreement that they have already reached, on the other hand, the execution of the document is not an act necessary to the creation of an enforceable contract."

(Citations omitted.) *Brooks Peanut Co. v. Great Southern Peanut*, Ga. App. (746 SE2d 272) (2013). Stated differently, "assent to the terms of a contract may be given other than by signatures." (Citations and punctuation omitted.) *Terry Hunt Constr. v. AON Risk Svcs*, 272 Ga. App. 547, 552 (3) (613 SE2d 165) (2005) (issue of fact as to whether course of dealing between parties demonstrated assent to agreement). And

8

"assent may be implied from the circumstances," *Redmond & Co. v. Atlanta & Birmingham Air-Line R.*, 129 Ga. 133, 142-143 (2) (58 SE 874) (1907), and the conduct of the parties. *Tom Brown Contracting v. Fishman*, 289 Ga. App. 601, 603-604 (1) (658 SE2d 140) (2008).

Here, the record shows that Stillwater's attorneys informed Doss that an escrow agreement was required as a condition of the loan. Several draft agreements were provided by Doss, the last of which incorporated the revision requested by Stillwater's attorneys. The following day, Stillwater funded the loan, and this conduct can be construed as an assent to the last draft of the escrow agreement provided by Doss. While Lynn Doss asserts that she interpreted Prouty's 5:17 p.m. email, sent after the last version of the escrow agreement had been provided to Prouty, as rendering a portion of the escrow agreement "a mistake," she never communicated this belief to Stillwater's counsel or made any effort to withdraw or revise the last version of the escrow agreement she had drafted. Moreover, Prouty testified that her 5:17 p.m. email was not inconsistent with the terms of the escrow agreement and that she was informed by Doss' paralegal that a subordination agreement, consistent with the terms of the escrow agreement, had been obtained before she authorized a wire of the loan funds into Doss' escrow account.

Because genuine issues of material fact remain as to whether there was a meeting of the minds with regard to an escrow agreement, the trial court erred by granting summary judgment in favor of Doss on Stillwater's claim for breach of the escrow agreement. See *Terry Hunt Constr.*, supra, 272 Ga. App. at 552 (3) (trial court erred by granting summary judgment because course of conduct between parties created issues of fact regarding assent to unsigned written agreement); *Computer Maintenance Corp. v. Tilley*, 172 Ga. App. 220, 222 (1) (322 SE2d 533 (1984) (physical precedent only) (issues of fact exist as to whether party that failed to sign contract ratified contract by subsequent conduct and performance).

2. Doss argues, in the alternative, that we should affirm the trial court's grant of summary judgment in its favor because, as a matter of law, Stillwater suffered no damages as a result of its second-position lien on the 48.2 acre tract. According to Doss, no loss occurred because Stillwater received title to land valued at $5.6 million as a result of its foreclosure on the remaining tracts, an amount greater than the initial principal amount of the loan ($4.75 million). We disagree.

The deed to secure debt executed by Carroll provided: "in this Security Deed the definition of the Debt includes all the obligations and liabilities of Grantor under the Guaranty with respect to (i) the principal of the loans . . . , (ii) all accrued interest

10

thereon . . ." It also provided that the security deed would be cancelled only after "payment of the Debt." Stillwater was therefore entitled to exercise its power of sale under the security deed to collect accrued interest on the loan, and its inability to first exercise a power of sale on the 48.2 acre tract to offset accrued interest of $2,158,920.80 resulted in a loss. See OCGA § 13-6-2 ("[d]amages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach").

For the above-stated reasons, we reverse the trial court's grant of partial summary in Doss' favor in Case No. A13A0990.

## Case No. A13A0989

In this appeal, First American contends that the trial court erred by denying its motion for summary judgment on Stillwater's claims for coverage under the title insurance policy and for bad faith damages under OCGA § 33-4-6. First American also contends that the trial court erred by granting summary judgment in favor of Doss on First American's claim for attorney fees under an indemnity agreement. For the reasons explained below, we affirm the trial court's denial of First American's motion with regard to its liability under the policy, reverse the denial of summary

judgment with regard to bad faith damages, and affirm with regard to Doss' liability for attorney fees under the indemnity agreement.

3. First American contends that Stillwater has suffered no loss under the policy, because the value of the other foreclosed tracts upon which Stillwater received a first-position lien totaled $5.6 million and the amount insured by the policy was $4.75 million. In essence, First American contends Stillwater suffered no loss within the meaning of the policy as a result of its failure to obtain a first-position lien on the 48.2 acre tract. Stillwater, on the other hand, asserts that the policy language is ambiguous with regard to how an insured's monetary loss under the policy is calculated and that the ambiguity must be construed against First American and in favor of coverage.

The cover page of the policy states that First American, subject to policy conditions, exclusions, exceptions, and stipulations, "insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of . . . [t]he priority of any lien or encumbrance over the lien of the insured mortgage." The policy does not define the term "loss or damage." The amount of insurance listed in Schedule A of the policy is $4.75 million. Schedule A also states: "The instruments

12

creating the estate or interest in real estate which is hereby insured are described as follows: By that certain deed to secure debt, security agreement and assignment of leases from Steven W. Carroll to . . . Stillwater. . . ."

Section 7 (a) of the policy, under "Determination and Extent of Liability." provides:

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the amount of insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in Section 2 (c) of these Conditions and Stipulations;

(ii) the amount of unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time of loss or damage insured against by this policy occurs, together with interest thereon; or

(iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

Section 9 of the policy, titled "Reduction of Insurance; Reduction or Termination of Liability," provides:

13

(a) All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2 (a) of these Conditions and Stipulations shall not reduce pro tanto the amount of the insurance afforded under this policy except to the extent that the payments reduce the amount of indebtedness secured by the insured mortgage.

(b) Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the Amount of Insurance stated in Schedule A.

(c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2 (a) of these Conditions and Stipulations.

The trial court found "an ambiguity in the above [p]olicy language regarding whether the insurer's liability under the Policy is intended to include accrued interest on a loan, notwithstanding the insured's recovery of the principal loan amount."

(a) For the reasons explained below, we agree with the trial court's conclusion that First American was not entitled to summary judgment, but do so for a different reason. First American contends that the policy limit was reduced below zero based upon the interplay between Section 7 (a) (ii) and Section 9 (b) of the policy. Specifically, First American asserts that *before* Stillwater foreclosed, the outstanding principal balance on its loan was $4.75 million, that Stillwater received title to land valued at $5.6 million in the foreclosure sale of the parcels for which it received a first position lien, and that the principal balance of $4.75 million must be reduced by the $5.6 million value, resulting in a number less than zero.

Section 7 (a) (ii) states:

> The *liability* of the Company under this policy shall not exceed the least of . . . *the amount of the unpaid principal indebtedness* secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations *or as reduced under Section 9* of these Conditions and Stipulations, at the time the loss or damage insured against by this policy occurs, together with interest thereon. (Emphasis supplied.)

The first sentence of Section 9 (b) provides that "[p]ayment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, . . . shall reduce *the amount of insurance* pro tanto." (Emphasis supplied.)

15

Section 9 (b) provides a stand-alone method for the calculation of the *amount of insurance*, but the stated purpose for Section 7 of the policy is to provide for the amount the Company is *liable* for under the policy, not the *amount of insurance*.

Examination of the policy as a whole clarifies that the *amount of insurance* is not necessarily the amount which First American is *liable* to pay; nor is it necessarily the amount stated in Schedule A of the policy. Section 2 (c)[5] of the policy, referenced in a different portion of Section 7,[6] provides:

> The amount of insurance after acquisition or after the conveyance shall in neither event exceed the least of:
>
> (i) the amount of insurance stated in Schedule A;
>
> (ii) the amount of the principal of the indebtedness secured by the insured mortgage as of Date of Policy, interest thereon, expenses of foreclosure, amounts advanced pursuant to the insured mortgage to assure compliance with laws or to protect the lien of the insured mortgage prior to the time of acquisition of the estate or interest in the

---

[5] Section 2 of the policy is titled "Continuation of Insurance" and subsection 2 (c) is titled "Amount of Insurance."

[6] Section 7 (a) (i) provides that one alternative calculation of First American's potential liability under the policy is "the amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance defined in Section 2 (c) of these Conditions and Stipulations."

16

land and secured thereby and reasonable amounts expended to prevent deterioration of improvements, but reduced by the amount of all payments made; or

(iii) the amount paid by any governmental agency or governmental instrumentality, if the agent or instrumentality is the insured claimant, in the acquisition of the estate or interest in satisfaction of its insurance contract or guaranty.

Section 9 (b), which provides a calculation for the amount of insurance, does not provide a calculation to reduce the amount of unpaid principal. Instead, it provides that principal, as well as interest,[7] paid under the policy will reduce the *amount of insurance*. The portion of Section 7 (a) (ii) stating "the amount of the unpaid principal indebtedness . . . as reduced under Section 9" therefore inexplicably references a formula for the reduction of the amount of insurance, not the unpaid principal indebtedness.

In this case, even after taking into account the applicable rules of contract construction,[8] we conclude that Section 7 (a) (ii) is too vague and uncertain to be

---

[7] The phrase "any other obligation secured by the insured mortgage" in Section 9 (b) would certainly include accrued interest.

[8] See, e. g., OCGA §§ 13-2-2 and 33-24-16.

17

enforced. Simply put, the phrase at issue is incomprehensible and cannot support *any*

clear meaning, much less two alternate meanings, for the policy language employed

by First American when drafting Section 7 (a) (ii) of the policy.[9]

"An insurance contract will be deemed ambiguous only if its terms are subject

to more than one reasonable interpretation. The policy should be read as a layman

would read it and not as it might be analyzed by an insurance expert or an attorney."

(Citation and punctuation omitted.) *State Farm Mut. Auto. Ins. v. Staton*, 286 Ga. 23,

25 (685 SE2d 263) (2009). As this court has previously recognized, "[t]here is a

difference between ambiguity, which imports doubleness and uncertainty of meaning,

and that degree of indefiniteness which imports no meaning at all." (Citations and

punctuation omitted.) *A. S. Reeves & Co. v. McMickle*, 270 Ga. App. 132, 134 (605

SE2d 857) (2004).

> [A] word or phrase is ambiguous only when it is of uncertain meaning,
> and may be fairly understood in more ways than one. An ambiguity,
> then, involves a choice between two or more constructions of the
> contract. Where, as here, there is no ambiguity, and the terms of the

---

[9] As one court has noted, "It is all too clear that contract language, while at times a great explainer, is at times a great obscurer. It is incumbent upon insurance companies to state clearly the perimeters of their coverage to those who entrust their security to them." *Ranger Ins. Co. v. Culberson*, 454 F.2d 857, 867 (III) (5th Cir. 1971).

contract are not set out with sufficient particularity to enable the court to say what in fact was intended by the parties as full compliance, then the matter of a choice between two or more constructions is not involved.

(Citations and punctuation omitted.) *Burden v. Thomas*, 104 Ga. App. 300, 302-303 (121 SE2d 684) (1961).

(b) The proposed interpretations by the dissent and the special concurrence should not be used to find alternate meanings and ambiguity, because both fail to focus on the fact that Section 7 (a) (ii) of the policy attempts to use a formula from Section 9 (b) for the reduction of the *amount of insurance* to reduce the amount of the *unpaid principal indebtedness*. We cannot, as proposed by the dissent, take a portion of the formula, payments listed under Section 9 (b), and then subtract it from the amount of unpaid principal indebtedness in Section 7 (a) (ii). Nor can we, as proposed by the special concurrence, conclude that unpaid principal indebtedness in Section 7 (a) (ii) is calculated by subtracting the value of the foreclosed property from the total amount of outstanding debt (principal and accrued interest). While the interpretation offered by the special concurrence provides a sensible approach for what a title insurance policy *should* provide in the abstract, we cannot rewrite a poorly drafted policy to impart meaning to a formula that cannot be calculated by the

19

policy's express terms. Contrary to the position of both the dissent and the special concurrence, we simply cannot take a portion of a formula for reducing the *amount of insurance* in Section 9 (b) and use it to reduce *unpaid principal indebtedness* under Section 7 (a) (ii).

We also disagree with the position that a title policy is not intended to provide coverage for the loss of a lender's ability to collect accrued interest on a debt through foreclosure of a security deed based upon its failure to receive a first position lien. While it is true that title policies do not insure the value of the subject property or the payment of debt secured by the property, it does insure "loss or damage" incurred as a result of later discovered defects in the title. Therefore, "[f]or purposes of title insurance, a mortgagee's loss is measured by the extent to which the insured debt is not repaid because the value of the security property is diminished or impaired by outstanding lien encumbrances or title defects covered by title insurance." *Couch on Insurance 3rd Ed.*, §185.87 (2012). And unpaid debt includes accrued interest on a loan. See, e.g., *Southwest Title Ins. v. Northland Bldg. Corp.*, 542 SW2d 436, 453 (Tex. App. Ct. 1976) ("Amount of the loss was not only the amount of the unpaid principal but the loss of interest provided for in said note."), reversed on other grounds, *Southwest Title Ins v. Northland Bldg. Corp.*, 552 SW2d 425, 430 (Tex.

20

1977). Nonetheless, a mortgagee cannot recover all of its unpaid debt, including accrued interest, if the value of the property at issue *without* the title defect is not enough to satisfy the entire unpaid debt. See *Couch on Insurance 3rd Ed.*, §185.88 (2012). Instead, as here, it may only recover "the value of the property, not the amount due on the mortgage." Id.

Finally, if, as proposed by the dissent, the parties had intended for First American to have no liability for any accrued interest on the principal of the loan, the policy could have simply defined the "loss or damage" covered by the policy to exclude any accrued interest on the original principal amount of the loan. Instead, the policy contains no definition of the term "loss or damage," and the formula in Section 7 (a) (ii) is incomprehensible. Additionally, Section 2 (c) (ii) of the policy, construed in favor of coverage, includes accrued interest on the principal amount of the mortgage when calculating one of three alternative insurance amounts following acquisition of an interest in the property by a mortgagor through foreclosure. Therefore, the policy should not be construed to express an intent *against* the recovery of interest on the principal amount of the secured debt.

OCGA § 13-2-2 (6) cannot be applied here to construe the policy to find no coverage. This Code section provides only that "[t]he rules of grammatical

21

construction usually govern, but to effectuate the intention they may be disregarded; sentences and words may be transposed, and conjunctions substituted for each other. In extreme cases of ambiguity, where the instrument as it stands is without meaning, words may be supplied." Here, the dissent fails to specify what words should be supplied to effect the purported intent of the parties, and OCGA § 13-2-2 (6) does not provide for the *replacement* of words other than conjunctions. Cf. *Hamrick v. Kelley*, 260 Ga. 307, 307-308 (392 SE2d 518) (1990) (even where 'blue pencil' method is available, a court may not "*reform* a contract which is otherwise unenforceable by reason of vagueness." Emphasis in original.); *New Atlanta Ear, Nose & Throat Assocs. v. Pratt*, 253 Ga. App. 681, 687 (2) (560 SE2d 268) (2002) (court cannot use blue pencil method to "rewrite a contract void for vagueness"). "It is the function of the court to construe the contract as written and not to make a new contract for the parties." (Citation and punctuation omitted.) *Waste Mgmt. v. Appalachian Waste System*, 286 Ga. App. 476 (649 SE2d 578) (2007). Because we cannot write a new insurance contract for the parties and Section 7 (a) (ii) of the policy provides for a formula that cannot be calculated, we conclude that Section 7 (a) (ii) is too indefinite to be enforced.

(c) Having concluded that Section 7 (a) (ii) of the policy is too indefinite to be enforced,[10] we turn to whether First American has any liability under Section 7 (a) (i) or 7 (a) (iii) of the policy because it is liable for the lesser of the amounts determined by these subsections.[11] The applicable amount under Section 7 (a) (i) is plainly the amount of insurance listed in Schedule A of the policy – $4.75 million. Section 7 (a) (iii) requires a closer analysis.

Under Section 7 (a) (iii), First American is liable for "the difference between the value of the insured estate or interest *as insured* and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy."

---

[10] The policy included the following severability clause: "In the event any provision of this policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect."

[11] Section 9 (b), standing alone after Section 7 (a) (ii) is severed from the policy, cannot be used to calculate First American's *liability* under the policy. As stated previously, Section 9 (b) only provides a calculation for a reduction in the amount of insurance. While Section 7 (a) (i) could be interpreted to include the amount of insurance calculated under Section 9 (b), it could be interpreted in the alternative as including *only* the amount of insurance stated in Schedule A or defined in Section 2 (c) of the policy. As any ambiguity regarding the interplay of Section 9 (b) and Section 7 (a) (i) must be construed against the insurer, Section 9 (b) should not be used to determine First American's liability under Section 7 (a) of the policy. See *State Farm Mut. Auto Ins. v. Staton*, 286 Ga. 23, 25 (685 SE2d 263) (2009).

23

(Emphasis supplied.) We must therefore consider the precise meaning of the phrase "as insured."

In a case involving an owner's claim for title insurance under identical policy language, this Court noted that "the general method for computing damages for breach of a title insurance policy . . . is the difference between the value of the property when purchased with the encumbrance or encroachment thereon, and the value of the property as it would have been if there had been no such encumbrance or encroachment." (Citation, punctuation and footnote omitted.) *Jiminez v. Chicago Title Ins.*, 310 Ga. App. 9, 15 (3) (a) (712 SE2d 531) (2011). See also *Jurney v. Ticor Title Ins.*, 2012 U. S. Dist. LEXIS 43654 at *6 (III) (A) (N.D. Ga., March 29, 2012).

In *Jiminez*, supra, the owner purchased two parcels that constituted the estate insured by the policy, but subsequently lost title to one of the parcels following a quiet title action. Id. at 10. Based upon evidence in the record showing the separate value of the two parcels, we affirmed the trial court's conclusion that the owner presented evidence of the diminished value of his property as a result of the title defect. Id. at 14-15 (3) (a).

Here, the record shows that Stillwater received title at the foreclosure sale to a portion of the insured estate with a value of $5.6 million. It did not receive any

24

value for the portion of the insured estate upon which BB&T foreclosed, and the record shows that BB&T paid $1 million for title to this portion of the insured estate at the foreclosure sale. As this evidence supports the conclusion that First American is liable for an amount more than zero under Section 7 (a) (iii) of the policy,[12] we affirm the trial court's denial of First American's motion for summary judgment.

4. First American also contends that the trial court erred in concluding that issues of fact precluded summary judgment in its favor on Stillwater's claim for bad faith failure to pay under OCGA § 33-4-6. It contends that Stillwater served its bad faith notice before payment was due, that Stillwater failed to wait the requisite 60 days to file suit, and that it "had valid grounds not to pay Stillwater's claim and has acted in good faith." We agree.

OCGA § 33-4-6 (a) provides, in relevant part:

In the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability

---

[12] While it could be argued that "as insured" refers to the amount of insurance, any ambiguity must be construed against the insurer and in favor of coverage. See *State Farm*, supra, 286 Ga. at 25.

of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer.

Because this Code section provides for a penalty, it must be strictly construed. *Interstate Life & Accident Ins. Co. v. Williamson*, 220 Ga. 323, 325 (2) (138 SE2d 668) (1964). And "the insured bears the burden of proving that the refusal to pay the claim was in bad faith." (Citations, punctuation and footnote omitted.) *Jimenez*, supra, 310 Ga. App. at 12 (2).

"It has long been the law that in order to serve as a bad faith demand, the demand must be made at a time when immediate payment is due." (Citations, punctuation and footnote omitted.) *Lavoi Corp. v. Nat. Fire Ins.* , 293 Ga. App. 142, 146 (1) (b) (666 SE2d 3 87) (2008). In this case, the policy expressly provides that it "is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described." (Emphasis supplied.) Additionally, it states: "When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter." Finally,

26

the policy provides First American with several alternative options when a claim is made under the policy. These options include: paying the amount of insurance; purchasing the indebtedness; paying the amount of insurance together with costs, attorney fees, and expenses authorized by the insurer; purchasing the indebtedness secured by the insured mortgage for the amount owing together with costs, attorney fees and expenses authorized by the insurer; and paying or otherwise settling with parties other than those insured by the policy.

In this case, the record shows that in a letter dated February 16, 2010, Stillwater first notified First American of its intent to seek bad faith damages under OCGA § 33-4-6. This letter states that BB&T foreclosed on the 48.2 acre tract on April 7, 2009[13] and contends that Stillwater suffered a loss on the date that BB&T foreclosed. Stillwater contended that the appraised value of the remaining tracts securing the loan totaled $4,426,740 and that it was not necessary for it to "foreclose on and resell the remaining property to establish its loss" as previously asserted by First American. Stillwater did not disclose that on April 7, 2009, almost a year earlier,

_____

[13] The record shows that BB&T actually foreclosed on July 7, 2009.

it had foreclosed upon the remaining collateral with a bid price of $5.6 million.[14] Stillwater filed suit against First American on Monday, April 19, 2010. First American asserts that it did not learn that Stillwater had foreclosed and the total amount of its bids until after Stillwater had filed suit against it seeking bad faith damages.

Based upon its contention that Stillwater's "actual monetary loss or damage" was not fixed until Stillwater foreclosed upon its remaining collateral, as well as Stillwater's failure to inform First American of its foreclosure sale until after it had filed suit seeking bad faith damages, First American contends it cannot be held liable for bad faith damages and was entitled to summary judgment in its favor. We agree.

While the loss may have occurred by the time Stillwater sent its bad faith demand letter, Stillwater failed to inform First American that it had foreclosed on the remaining collateral almost a year earlier, even though First American had informed Stillwater months before that a foreclosure sale of the collateral was necessary for it to determine whether Stillwater had suffered a loss. Based upon Stillwater's failure

---

[14] One of Stillwater's foreclosure sales was confirmed on September 24, 2009 in the amount of $900,000. The others were confirmed on October 19, 2010 in the amount of $4.7 million. In each confirmation order, the superior court concluded that the property had sold on April 7, 2009 for its true market value.

to notify First American of critical facts pertaining to its loss[15] in its bad faith demand letter, it cannot hold First American liable for bad faith failure to pay damages.

First American's failure to take action to settle with BB&T before it foreclosed upon the 48.2 acre tract does not alter this conclusion. While First American may have had the option to take action earlier and settle with BB&T to provide Stillwater with a first position lien, it was not obligated to do so under the policy.[16] "Bad faith is shown by evidence that under the terms of the policy upon which the demand is made and under the facts surrounding the response to that demand, the insurer had no 'good cause' for resisting and delaying payment." (Citation and punctuation omitted.;

---

[15] Consideration of the amount obtained by a mortgagee through foreclosure of collateral is a recognized method for determining whether the mortgagee has suffered an actual monetary loss covered by the policy. See *Chicago Title Ins. Co. v. Huntington Nat. Bank*, 87 Ohio St. 3d 270, 275 (719 NE2d 955) (1999); *Foothill Capital Corp. v. Commonwealth Land Title Ins. Co.*, 1987 U.S. Dist. LEXIS 13 783 * 6 (E.D. Pa., decided November 13, 1987). Cf. *Balboa Life & Cas. v. Home Builders Finance*, 304 Ga. App. 478, 480 (1) (697 SE2d 240) (20 10) (lender entitled to recover net loss after foreclosure from fire insurance carrier).

[16] As one commentator has noted, "the insurer's liability to pay monetary compensation under the policy does not arise immediately upon the existence of a covered defect [in the title] being proved. In fact, because the 'defect' or 'encumbrance' at issue may arise in various contexts ... , title insurance policies commonly afford the insurer a range of options by which it may fulfill its obligations pursuant to the policy." *Couch on Insurance 3rd Ed.*, §159:9 (2012).

29

Emphasis in original.) *Lawyers Title Ins. Corp. v. Griffin*, 302 Ga. App. 726, 731 (2) (b) (691 SE2d 633) (2010).

For the above-stated reasons, we reverse the trial court's denial of First American's motion for summary judgment on Stillwater's bad faith claim under OCGA § 33-4-6.

5. In its remaining enumeration of error, First American claims that the trial court erred by denying partial summary judgment in its favor with regard to Doss' liability under the agency agreement for attorney fees. We disagree.

Section 11 of the agency agreement between Doss and First American obligated Doss "to indemnify [First American] for all loss, cost or damage which [First American] may sustain or become liable for on account of" various acts. The trial court concluded that the phrase "all loss, cost or damage" did not include attorney fees, based upon its obligation to "strictly construe the contract against the indemnitee."

In Georgia, "attorney fees are not generally recoverable as damages absent an *express* provision in a contract or a statutory mandate." (Citations and punctuation omitted; emphasis in original.) *George L. Smith &c. v. Miller Brewing Co.*, 255 Ga. App. 643, 644 (566 SE2d 361) (2002). See also OCGA § 13-6-11 ("The expenses of

30

litigation generally shall not be allowed as a part of the damages.") Black's Law

Dictionary defines "express" as follows:

> Clear; definite; explicit; plain; direct; unmistakable; not dubious or ambiguous. Declared in terms; set forth in words. Directly and distinctly stated. Made known distinctly and explicitly, and not left to inference. Manifested by direct and appropriate language, as distinguished from that which is inferred by conduct. The word is usually contrasted with "implied."

(Citation omitted.) Black's Law Dictionary, p. 580 (6th ed. 1990).

In this case, one would have to infer that the phrase "loss, cost, or damage" also includes attorney fees, because the indemnity agreement does not set forth the words "attorney fees." See *National Minority &c. v. First National Bank*, 83 FSupp.2d 1200, 1205 (III) (B) (4) (D. Kan. 1999). We therefore conclude that the indemnity provision in the agency agreement did not expressly provide for attorney fees, and the trial court properly denied First American's motion for summary judgment on this issue. See id. at 1206 (B) (5); *Bowers v. Fulton County*, 227 Ga. 814, 816 (1) (183 SE2d 347) (1971) ("general rule is that attorney fees are not included in the term 'costs' or

'expenses' in the absence of some statutory provision, rule of court, or by contract of the parties"); *Georgia L. Smith II*, supra, 255 Ga. App. at 644.[17]

*Case No. A13A0988*

In this appeal, Doss contends that the trial court erred by granting partial summary judgment in favor of First American with regard to its claim of indemnity against Doss under the agency agreement. The trial court's summary judgment order

---

[17] We note First American's reliance upon a federal decision concluding that an indemnity agreement encompassed attorney fees based on the phrases "any and all loss, cost, damage and expense" and "all loss, damage, and expense." *Brown v. Seaboard Coast Line R. Co.*, 554 F2d 1299, 1304 (III) (5th Cir. 1977). We are not persuaded by the 5th Circuit's interpretation, however, because it overlooked the long-standing Georgia rule that attorney fees cannot be recovered in the absence of an *express* contract provision and applied a *federal* rule interpreting indemnity agreements broadly with regard to the type of damages recoverable. See *Agulnick v. American Hosp. Supply Corp.*, 507 FSupp. 135, 137 (Mass. 1981) (noting "general interpretive rule in federal court that indemnity provisions will be broadly construed once the right to indemnification is established").

In its motion for reconsideration, First American cites for the first time to our opinion in *Davis v. Southern Exposition Mgmt.*, 232 Ga. App. 773, 776-777 (5) (503 SE2d 649) (1998), as authority authorizing its recovery of attorney fees under the indemnity agreement. In *Davis*, we remanded the case to the trial court for an evidentiary hearing to establish the amount of attorney fees owed under an indemnification agreement, because a portion of the fees might have been incurred in connection with claims for which no indemnity was owed. Id. We did not address whether the particular language of the indemnity agreement authorized the recovery of attorney fees, and this issue was not raised by the parties. While a portion of the indemnity agreement was quoted in the opinion, *Davis* did not hold and does not stand for the proposition that the phrase "all loss, cost or damage" should be construed to include attorney fees.

states "that Doss has an obligation to indemnify First American for 'all loss, cost or damage,' other than attorneys' fees, incurred in the event of a judgment in favor of Stillwater against First American due to the failure of Stillwater to secure a first priority lien position in the 48.2 acre tract."

6. Doss contends that the trial court's ruling was premature because "genuine issues of material fact exist regarding Stillwater's claims against Doss" and because it could be forced to indemnify First American even if "Stillwater's claims against Doss are never proven." We disagree.

The indemnity agreement required Doss

to indemnify [First American] for all loss, cost or damage which [First American] may sustain or become liable for on account of: . . .

b. . . . (2) Failure of any commitment or policy issued by Agent or through Agent's office . . .

(c)  to reflect an appropriate requirement or exception therein as to any lien, claim, encumbrance or other defect . . .

(ii)  disclosed by the approved attorney's or title examiner's title report or opinion, or

(iii)   known to Agent (including but not limited to matters not of record); unless Agent is expressly authorized in writing by [First American] to disregard same.

Contrary to Doss' argument, the plain language of this agreement does not require a judgment *against Doss* for its liability under the indemnity agreement to be established. Instead, it requires Doss to indemnify First American for *First American's liability* as outlined in the indemnity provision. Therefore, a finding of Doss' liability to Stillwater is not the event which triggers its obligation to indemnify First American.

Here, the record shows, without dispute, that the title policy included the 48.2 acre tract, but did not include an exception for the first position BB&T mortgage. It also shows, without dispute, that Doss was aware of BB&T's first position lien. As Stillwater's claim against First American is predicated upon the existence of BB&T's first priority lien, the trial court did not err by concluding that Doss was obligated to indemnify First American in the event that Stillwater prevailed against First American on its claim under the policy. See *Superior Rigging &c. v. Ralston Purina Co.*, 172 Ga. App. 79, 80 (2) (322 SE2d 95) (1984) ("judgment fixing legal liability is not a condition precedent to recovery pursuant to a contractual indemnity clause"). We

34

therefore affirm the trial court's grant of partial summary judgment in First American's favor on the issue of Doss' liability for indemnity under the agency agreement.

7. Doss' enumeration of error regarding its obligation to indemnify First American for bad faith damages under OCGA § 33-4-6 is rendered moot by our holding in Division 4 granting summary judgment in favor of First American on Stillwater's bad faith claim.

*Conclusion*

8. For the above-stated reasons, we affirm the trial court's grant of partial summary judgment in favor of First American against Doss with regard to its claim of indemnity under the agency agreement in Case No. A13A0988. In Case No. A13A0989, we affirm the trial court's denial of First American's motion for summary judgment with regard to its liability to Stillwater under the policy and reverse the trial court's denial of summary judgment to First American with regard to its liability for bad faith damages. We affirm the trial court's grant of summary judgment in favor of Doss on the issue of Doss' liability for attorney fees under an indemnity agreement. In Case No. A13A0990, we conclude that genuine issues of material fact preclude

summary judgment in favor of Doss on Stillwater's claim for damages under an oral escrow agreement.

*Judgment affirmed in Case No. A13A0988; affirmed in part, reversed in part in Case No. A13A0989; and reversed in Case No. A13A0990. Ellington, P. J. concurs; Branch, J. concurs fully in all but Div. 3 and in the judgment only as to Div. 3. Doyle, P. J. concurs fully in all but Div. 3 and specially as to Div. 3; Barnes, P. J. and Phipps, C. J. concur fully in all but Div. 3 and in the judgment only with Doyle, P. J. as to Div. 3. McFadden, J., concurs fully in all but Div. 3 and 4 and dissents as to Div. 3, and concurs in the judgment only as to Div. 4.*

A13A0988. DOSS & ASSOCIATES v. FIRST AMERICAN TITLE
     INSURANCE COMPANY, INC.

A13A0989. FIRST AMERICAN TITLE INSURANCE COMPANY
     v. DOSS & ASSOCIATES.

A13A0990.  GEROVA ASSET BACKED HOLDINGS, L. P. v.
     DOSS & ASSOCIATES.

DOYLE, Presiding Judge.

I concur fully in all but Division 3.  I concur in the judgment in Division 3, but

disagree that the policy language is too vague or uncertain to be enforced.

In order to determine if there is coverage and the amount, if any, we look to

Sections 7 and 9 of the title insurance policy. Section 7 (a), "Determination and

Extent of Liability," provides:

> The liability of the Company under this policy shall not exceed the least
> of: (i) the amount of Insurance stated in Schedule A, . . . ; (ii) the amount
> of the unpaid principal indebtedness secured by the insured mortgage

. . . as reduced under Section 9 of these Conditions and Stipulations, at the time the loss or damage insured against by this policy, occurs, together with interest thereon; or (iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.    Here, under Section 7 (a) (i), the amount set forth in Schedule A is $4.75 million. Under Section 7 (a) (iii), the difference in value of the property as insured and its value subject to the defect, lien, or encumbrance is greater than zero.[1] This leaves only a determination of the value under Section 7 (a) (ii). If such value is less than or equal to zero, summary judgment in favor of First American is proper. If not, summary judgment should be denied.

Section 7 (a) (2) is a determination of the amount of unpaid principal indebtedness, which in this case is determined by the calculations set forth in Section 9 (b) for the reduction of insurance, which provides:

Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of

---

[1] Taking Stillwater's allegations as true, Stillwater was granted a deed to secure debt on seven parcels of property. Because Doss failed to properly secure Stillwater a first position priority on all seven tracts, Stillwater was limited to foreclosing on only six tracts, and therefore, it has been damaged in some amount greater than zero.

2

the payment, satisfaction or release, shall reduce the amount of insurance pro tanto.[2]

Here, the amount of unpaid principal indebtedness is the amount of principal remaining on the loan after the application of the foreclosure payment, first to accrued interest,[3] with any balance applied to principal. Because the amount of unpaid principal indebtedness remaining is greater than zero, First American is not entitled to summary judgment.[4]

---

[2] Section 9 (b) also allows, after any such payment, satisfaction or release, for the amount of insurance to increase by accruing interest and advances made to protect the lien, "provided in no event shall the amount of insurance be greater than the amount of insurance stated in Schedule A." Whether or not any interest has accrued since the foreclosure or advances have been made does not impact the outcome of this appeal because it is for the parties to prove any such amounts at trial.

[3] As the majority concludes, the phrase "any other obligation" contained in Section 9 (b) includes interest payments. Here, the deed to secure debt in this case provides that payments towards the debt are applied first to interest and then to principal, which comports with OCGA § 7-4-17 ("When a payment is made upon any debt, it shall be applied first to the discharge of any interest due at the time, and the balance, if any, shall be applied to the reduction of the principal. . . ."). The title policy is silent with regard to the order of the application of principal and interest payments.

[4] The language "together with interest thereon" set forth in Section 7 (a) (ii) is not vague or ambiguous. Once the amount of "unpaid principal indebtedness" is determined, the insured can recover "interest thereon." OCGA § 7-4-2 (a) (1) (A) sets forth the legal rate of interest as "[seven] percent per annum simple interest where the rate percent is not established by written contract." The insurance policy in this case does not identify a specific interest rate.

I am authorized to state that Chief Judge Phipps and Presiding Judge Barnes concur in the judgment only.

A13A0988. DOSS & ASSOCIATES v. FIRST AMERICAN TITLE
INSURANCE COMPANY, INC.

A13A0989. FIRST AMERICAN TITLE INSURANCE COMPANY
v. DOSS & ASSOCIATES.

A13A0990. GEROVA ASSET BACKED HOLDINGS, L. P. v.
DOSS & ASSOCIATES.

MCFADDEN, Judge, concurring in part and dissenting in part.

I concur fully in all but Divisions 3 and 4. I respectfully dissent in Division 3 and concur in the judgment only in Division 4. I would hold, as to Division 3, that the title insurance company, First American, has no liability on the subject claim and, as to Division 4, that the insurance company is consequently entitled to summary judgment on the attorney fees claim against it.

The issue that divides us is the construction and application of Section 7 (a) of the policy, which sets out the extent of the insurer's liability on the subject claim. To paraphrase Section 7 (a), it sets that liability at the least of three specified amounts: (i) the amount of coverage available; (ii) the value of the property interest insured; or (iii) the amount of the loss.

More particularly, our disagreement focuses on Section 7 (a) (ii). Like Presiding Judge Doyle, I would hold that Section 7 (a) (ii) is enforceable. But she and I part ways as to its proper construction. I am persuaded by the argument of the title insurance company, that the parties agreed only to coverage of the value of the title insured – that is, the value of the security interest its insured, Stillwater, was to have acquired – and that the insurance contract was not intended to cover the full benefit of the insured's bargain with its borrower. And I am persuaded that Section 7 (a) (ii) gives effect to that intent by specifying that the insurer would be liable only for the principal amount of the secured debt, not for interest or for other payments to which the insured may have been entitled under the terms of its agreement with its borrower.

Section 7 (a) (ii) specifies that the insurer's liability shall not exceed "(ii) the amount of unpaid principal indebtedness secured by the insured mortgage . . . as

2

reduced under Section 9 . . . at the time [of] the loss or damage, . . . together with interest thereon."

Section 9 repeatedly makes clear that those reductions include payments and parts of payments that, as between insured Stillwater and its borrower, would be allocated to interest. Section 9 provides:

(a) All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2 (a) of these Conditions and Stipulations shall not reduce pro tanto the amount of the insurance afforded under this policy except to the extent that the payments reduce the amount of indebtedness secured by the insured mortgage.(b) *Payment in part by any person or the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto.* The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the Amount of Insurance stated in Schedule A.

(c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2 (a) of these Conditions and Stipulations.

3

(Emphasis supplied.)

It is undisputed that the initial principal amount of the loan was $4.75 million and that the foreclosure proceeds were $5.6 million. The foreclosure proceeds in this case are payments identified in Section 9 (b), emphasized above, in that they are payments on the principal and other obligations (e.g., interest) secured by the insured mortgage. Read together, Sections 7 (a) (ii) and 9 require that the amount of the foreclosure proceeds be subtracted from the principal amount and provide that, as the sum is less than zero, the insurance company has no liability.

Contrary to the majority opinion, Section 7 (a) (ii) is not incomprehensible. It is not too vague and uncertain to be enforced.

"The cardinal rule of contract construction is to ascertain the intent of the parties at the time they entered the agreement. If that intention is lawful and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical and arbitrary rules of contract construction." *Gonzalez v. Crocket*, 287 Ga. 430, 433 (696 SE2d 623) (2010) (citation omitted). This rule requiring us to give a contract "that meaning which will best carry into effect the intent of the parties," as with other pertinent rules of contract interpretation, must be applied before we can reach a conclusion concerning whether a contract has the required

4

definiteness to be enforced. See *McLendon v. Priest*, 259 Ga. 59, 60 (376 SE2d 679) (1989).

"[W]henever possible, a contract should not be construed in a manner that renders any portion of it meaningless." *Schwartz v. Schwartz*, 275 Ga. 107, 109 (2) (561 SE2d 96) (citations omitted). "The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part[.]" OCGA § 13-2-2 (4).

We must therefor presume that when the parties included in Section 7 (a) (ii) a provision that First American's liability "shall not exceed . . . the amount of unpaid principal indebtedness secured by the insured mortgage . . . as reduced under Section 9 . . . at the time [of] the loss or damage, . . . together with interest thereon," they intended the phrase "as reduced under Section 9" to have some meaning.

It is true that Section 9 addresses the amount of coverage provided by the policy as a whole, while Section 7 addresses First American's liability for particular claims. This does not make it impossible, as the majority contends, to discern meaning from the reference to Section 9 within Section 7. While insurance coverage and liability for a particular claim are different, they are closely related. Indeed it would be remarkable if the formulae for calculating them did not contain overlapping

5

elements. So there is no logical impediment to incorporating components of Section 9's formula for calculating insurance coverage into Section 7 (a)'s formula for calculating liability. Both sections can and should be read to reflect the parties' intent to cover only the value of the insured's security interest and not to extend coverage under the policy to the full benefit of the insured's bargain with its borrower. So the phrase "as reduced under Section 9" should be construed to mean that the calculations prescribed in Section 9 for determination of the coverage provided by the policy as a whole are to be adapted to the calculation of First American's *liability* under Section 7 (a) (ii) for the particular claim at issue.

By clear implication, Section 7 (a) (ii) prescribes that the payments used in the formula for calculating insurance coverage under Section 9 are also to be used in the formula for calculating liability under Section 7. But even if, as the majority asserts, the phrase "as reduced under Section 9" renders Section 7 (a) (ii) incomprehensible, we are authorized and directed to add language to make that implied prescription explicit. OCGA § 13-2-2 (6) directs, "In extreme cases of ambiguity, where the instrument as it stands is without meaning, words may be supplied."

Section 7 (a) (ii) unambiguously expresses the parties' intent that First American not be liable for more than the amount of the unpaid principal

indebtedness. While it would be entirely possible and sensible to write a policy to impose liability for accrued interest as well, the language of this policy did not do so.

Presiding Judge Doyle's special concurrence would have us interpret the phrase "unpaid principal indebtedness," as that phrase is used in Section 7 (a) (ii), to – in effect – include *both* principal and interest. But even if we ignore Section 9, that interpretation is unsustainable. It is contrary to the plain meaning of that phrase. The phrase refers only to *principal*. See OCGA § 13-2-2 (2) (words in contracts "generally bear their usual and common signification").

OCGA § 7-4-17, cited in the special concurrence, is not applicable here, even though it controls allocations of payments to principal and interest. That code section regulates the rights and obligations of debtors and creditors, not insurers and insureds. And that code section does not undertake to define "unpaid principal indebtedness."

It is true that Section 7 (a) (ii) does contain language providing that the insurance company can be liable for "interest thereon." But that language refers to interest on the amount the insurance company owes to its insured. That language does not contradict the other language limiting the amount the insurer owes its insured on this claim to the principal amount of the indebtedness.

7

Here that unpaid principal indebtedness, and therefore the insurance company's liability on the policy, is zero. The foreclosure proceeds in this case constituted a payment on the loan. See *Balboa Life & Cas. v. Home Builders Finance*, 304 Ga. App. 478, 479 (1) (697 SE2d 240) (2010). At $5.6 million, those proceeds alone exceeded the amount of principal that Stillwater loaned to its borrower. First American has no liability to Stillwater under Section 7 of the policy and is entitled to summary judgment thereon.